Wilbert COOK, Jr.

v.

Shirley S. CHATER,[1] Commissioner of Social Security.

Civ. A. No. N–94–2326.

United States District Court, D. Maryland.

May 30, 1995.

1. On March 31, 1995, the Social Security Administration became an independent agency, separating from the Department of Health and Human Services. Under section 106(d)(2) of the Social Security Independence and Program Improvement Act, Pub.L. No. 103–296, 108 Stat. 1464, 1477, and Fed.R.Civ.P. 25(d)(1), Shirley S. Chater, Commissioner of Social Security, is substituted for Donna E. Shalala, Secretary of Health and Human Services.

Allen F. Loucks, Asst. U.S. Atty., Lori Karimoto, Social Security Administration, Baltimore, MD, for defendant.

Robert M. Hyman, Counsel for Wilbert Cook, Jr.,

## MEMORANDUM OPINION

SCHULZE, United States Magistrate Judge.

Plaintiff Wilbert Cook, Jr. brought this action pursuant to 42 U.S.C. § 405(g) (Supp. 1995) for review of a final decision of the Commissioner of Social Security (Commissioner) denying his claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401–433. The parties consented to referral to a United States Magistrate Judge for all proceedings and final disposition. Both parties have filed motions for summary judgment which are ready for resolution. No hearing is deemed necessary. For the reasons set forth below, the decision of the Commissioner is affirmed.

### 1. Background.

Mr. Cook applied for Supplemental Security Income (SSI) on April 1, 1992, and for DIB on May 13, 1992, alleging an inability to work since September 4, 1980. His date last insured was March 31, 1985. Both applications were denied initially and upon reconsideration. An Administrative Law Judge (ALJ) heard the case *de novo* and, on April 19, 1994, found that Mr. Cook was presently disabled but was not disabled prior to April 1, 1992. Thus, Mr. Cook was awarded SSI from April 1, 1992, and was denied DIB. On June 2, 1994, the Appeals Council denied Mr. Cook's request for review, thus making the ALJ's determination the Commissioner's final decision.

### 2. Medical, Vocational and Other Evidence.

Mr. Cook alleged disability since September 4, 1980 due to back and leg problems which resulted from an injury at work. As his insured status expired on March 31, 1985, his condition as of that date controls his eligibility for DIB. At that time, he was 42 years old, with a high school education and past work experience as an unskilled laborer.

On September 5, 1980, Mr. Cook sought treatment for a work related back injury at Peninsula General Hospital Medical Center. An x-ray of his back was normal, and the examining physician diagnosed him with acute lumbar back strain.

On January 26, 1981, Mr. Cook began treatment with Lawrence F. Honick, M.D., complaining of severe, constant low back pain that radiated down the left hip and leg, with occasional numbness, tingling and weakness. Dr. Honick noted that Mr. Cook seemed to have considerable pain and discomfort when he rose from a sitting position. He stood with his spine somewhat flexed, walked with a limp on the left side, and had difficulty getting onto the examining table. The examination revealed considerable diminution in normal lumbar lordotic curve, approximately 75% restriction of spinal motion in all planes, no curvature reversal on forward flexion, severe tenderness in the left lumbar, left gluteal and left posterior thigh regions, and a tight musculature. His straight leg raising test was positive at twenty-five degrees on the left. Deep tendon reflexes were 1+ to the right knee, absent at the left knee, 1+ at the right ankle, and a trace at the left ankle. There was some decreased sensitivity over the lateral and posterior aspects of the calf radiating down into the plantar aspect of the foot. He also had tenderness over the greater trochanter [2] of the left hip.

X-rays of the lumbar spine were normal; x-rays of the pelvis showed a possible fracture or non-united ossification center. Dr. Honick opined that that Mr. Cook had a compression lesion of the lumbar spine and a herniated disc or a healing fracture, and recommended lumbar exploration. In a letter to Mr. Cook's attorney dated February 23, 1981, Dr. Honick opined that Mr. Cook could not return to work.

Dr. Honick re-evaluated Mr. Cook on June 23, 1981, after an L–4/5 and L–5/S–1 hemilaminectomy. Dr. Honick noted that the operation gave Mr. Cook no relief. X-rays revealed no changes in his back condition. Dr. Honick concluded that Mr. Cook had a temporary total disability of the back. On

---

**2.** The greater trochanter is a broad, flat process at the upper end of the lateral surface of the femur to which several muscles are attached.

*Dorland's Illustrated Medical Dictionary* 1748 (28th ed. 1994).

July 17, 1981, Dr. James Spence stated that Mr. Cook could return to work on August 4, 1981.

On October 16, 1981, Thomas B. Ducker, M.D., evaluated Mr. Cook and recommended a full orthopedic and neurological work-up, which was completed during a six day stay at the University of Maryland Hospital. The neurological examination was within normal limits on all but one day, when Mr. Cook had a depression of the reflexes. Plain and special x-rays of the spine, myelography of the spinal nerve roots, tomography, and electromyographic nerve conduction studies were all within normal limits.

As a result of these studies, Dr. Ducker concluded that Mr. Cook had a lumbosacral tearing problem which gave him pain, but did not have a consistent neurologic deficit. He recommended that Mr. Cook either try to return to a modified work schedule or apply for Workers' Compensation due to a twenty-five to thirty percent disability.

Dr. Alan Levine evaluated Mr. Cook on May 27, 1982. Mr. Cook moved extremely slowly around the examining room and was unable to come to a full straight position when rising from his chair. He had complete loss of normal lumbar curvature with spasm, was unable to stand and balance on one foot, and had markedly positive straight leg raising, more on the left, at about forty-five degrees. He had no weakness in his motor strength or in his lower extremity muscles and had decreased sensation on the lateral aspect of the left leg. Examination of his deep tendon reflexes indicated an absent left knee jerk, positive normal right knee jerk and symmetrical ankle jerks. He had some tenderness to palpation over the lower part of his lumbar spine, mostly from spasm. X-rays of the lumbar spine indicated no gross pathology but possible increased sclerosis at L–5/S–1 in the facet joints. Dr. Levine recommended additional testing and treatment through facet joint injections and, if the injections provided him with relief, a cast immobilization trial.

Dr. Levine re-evaluated Mr. Cook on September 21, 1982, one month after he received facet injections. Because the injections helped him for about three weeks, Dr. Levine suggested that Mr. Cook's pain originated in the facet joints. Dr. Levine recommended that Mr. Cook be placed in a cast to determine whether immobilization would provide him with relief. Dr. Levine wrote that Mr. Cook was somewhat improved since his initial visit but was not capable of returning to work.

Dr. Levine placed Mr. Cook in a cast for three weeks, which improved his symptoms. Dr. Levine performed a Harrington compression fusion from L–4/5 and L–5/S–1 on the left side. On March 22, 1983, Dr. Levine reported that Mr. Cook wore a jacket and was comfortable. After his leg was taken out of the cast on April 28, 1983, Mr. Cook indicated significant improvement in his back with some intermittent left thigh symptoms. On May 24, 1983, Mr. Cook reported that his back pain was resolved and that he was walking one and one-half miles per day. A myelogram and CT scan taken during a two day hospital stay in November, 1983, indicated no defects.

On February 1, 1984, Mr. Cook visited Stanley Friedler, M.D., and complained of low back pain. Dr. Friedler noted that Mr. Cook walked with a cane, used a TENS unit which helped him sleep, and received physical therapy. Dr. Friedler noted that Mr. Cook was in no acute distress but appeared uncomfortable, especially when standing. Examination of the cervical spine revealed no muscle spasm or tightness to palpation of the paracervical muscles. He had no tenderness to palpation of the trapezius or rhomboid muscles, full range of motion without pain, and intact sensation and motor strength. Examination of the lumbosacral spine revealed mildly restricted range of motion with discomfort at sixty degrees of forward flexion and with extension and lateral bending. He stood on his heels without demonstrable weakness. Quadriceps reflexes were 2+ on the right and 1+ on the left. Sensation and motor strength were intact. Straight leg raising was negative for pain in the low back. X-rays of the lumbosacral spine indicated solid fusion. Dr. Friedler opined that Mr. Cook had a thirty-five percent partial impairment of the lumbosacral spine and could not "resume working as a laborer. He will need

some type of training." He recommended three to four more weeks of physical therapy, but opined that Mr. Cook had probably reached his maximum improvement.

On January 18, 1985, Mr. Cook received emergency room treatment after a car accident. X-rays of his cervical spine indicated no evidence of fracture or dislocation. X-rays of his lumbosacral spine showed intact disc space and no evidence of fracture. X-rays of his chest and sternum were normal.

Dr. Honick examined Mr. Cook on April 18, 1985, for his complaints of pain in his neck, jaw, upper back, and chest as a result of the car accident. X-rays of his cervical spine indicated slight degenerative changes at C5/6/7. X-rays of his thoracic spine showed no abnormalities. Dr. Honick's impression was residual symptoms secondary to contusion of the neck and back. He did not recommend any treatment.

The record contains no medical evidence from April 18, 1985 until November 12, 1991, when Mr. Cook was seen at Peninsula General Hospital for low back pain that began when he carried groceries upstairs. On August 5, 1992, Mr. Cook was referred to Dr. Peter R. Sebastian, who evaluated him on February 5, 1993. The Commissioner also referred Mr. Cook for a number of consultive examinations, including an internal medical evaluation, a psychological examination, an audiological examination, and another medical examination.

At the hearing, Mr. Cook, who was represented by an attorney, testified that he hurt his back while working; he was cleaning a machine when a pressure hose threw him off balance onto a blade. He stated that after his first operation in 1981 he went back to work for three months but could not perform his duties and was fired.

Mr. Cook stated that he stopped seeking treatment for his back after 1985 because Dr. Spence moved to Florida and he could not find a doctor who would accept his company's payments. He testified that although he did not seek treatment from 1985 until 1991, his back condition was not getting better. He said that "someone would give me pain pills" which did not help, and "one day it hit me so hard, I ... had to go to the doctor." During those five years, he would watch television, read, lie in bed, and walk about a mile.

### 3. *ALJ's Decision.*

The ALJ evaluated Mr. Cook's claim for DIB using the five-step sequential process set forth in 20 C.F.R. § 404.1520 (1994). At the first step, the ALJ determined that Mr. Cook had not engaged in substantial gainful activity since September 4, 1980. At step two, the ALJ determined that Mr. Cook's lumbar condition was a severe impairment, but, at step three, that it did not meet or equal the level of severity found in the "Listing of Impairments" set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

At the fourth step, the ALJ determined that Mr. Cook had the residual functional capacity [3] to perform a full range of sedentary level work activity on or before March 31, 1985. The ALJ found that because Mr. Cook's past relevant work required greater than sedentary exertional activity, he was unable to return to his past work on or before March 31, 1985. At the fifth step, the ALJ recognized that the burden switched to the Commissioner to demonstrate that a significant number of jobs existed in the national economy that Mr. Cook could perform based on his age, education, work experience, and residual functional capacity. The ALJ applied the grids in 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.27, and found that Mr. Cook was not disabled on or before March 31, 1985, but was disabled as of April 1, 1992.

### 4. *Standard of Review.*

 The role of this court on review is to determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standards. 42 U.S.C. § 405(g); *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990); *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir.1987). Substantial evidence is

---

**3.** Residual functional capacity is what the claimant can do despite his limitations. 20 C.F.R.

§§ 404.1545(a).

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *quoting, Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). It is more than a scintilla, but less than a preponderance, of the evidence presented. *Shively v. Heckler,* 739 F.2d 987, 989 (4th Cir.1984). It is such evidence that a reasonable mind might accept to support a conclusion, and must be sufficient to justify a refusal to direct a verdict if the case were before a jury. *Hays,* 907 F.2d at 1456. This court cannot try the case *de novo* or resolve evidentiary conflicts, but rather must affirm a decision supported by substantial evidence. *Id.*

### 5. *Discussion.*

■ Mr. Cook challenges the finding that he was not continuously disabled from September 4, 1980. He first claims that he was "pretty much incapacitated within the meaning of [Section] 1.03" of the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1, on or before March 31, 1985. Section 1.03 of the Listing of Impairments relates to arthritis of a major weight-bearing joint (due to any cause) and requires:

> ... history of persistent joint pain and stiffness with signs of marked limitation of motion or abnormal motion of the affected joint on current physical examination. With:
>
> A. Gross anatomical deformity of hip or knee (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) supported by X-ray evidence of either significant joint space narrowing or significant bony destruction and markedly limiting ability to walk and stand; or
>
> B. Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint and return to full weight-bearing status did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.03. A "major joint" refers to the hip, knee, ankle, shoulder, elbow, or wrist and hand. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(D).

Mr. Cook had the burden of proving that his back impairment met or equaled this listing on or before March 31, 1985. *Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir.1992). Although the record contains many x-rays, none shows a gross deformity of the knee or hip. Nor did Mr. Cook produce evidence that he had reconstructive surgery or surgical arthrodesis of his hip, knee, ankle, shoulder, elbow, or wrist and hand. Thus, substantial evidence supports the ALJ's finding that Mr. Cook was not disabled at step three of the analysis.

Mr. Cook next alleges that "common sense" dictates that if he was disabled in 1992, he must also have been disabled in 1985. This logic is not persuasive, but in any event the question for this court is whether substantial evidence supports the finding that Mr. Cook could perform sedentary work on or before March 31, 1985. The court finds that it does.

After Mr. Cook's work accident on February 4, 1980, x-rays of his spinal area were essentially normal, except one of the pelvis which showed a possible fracture or nonunited ossification center. Although Mr. Cook still had pain after his first back surgery in 1981, the surgery revealed nothing abnormal and x-rays showed no changes. A full orthopedic and neurological work-up in 1982 was essentially normal; the doctor opined that Mr. Cook had a lumbosacral tearing problem with no consistent neurologic deficit. A spinal fusion performed on January 13, 1983, markedly decreased Mr. Cook's back pain. More than a year after his surgery, Mr. Cook's spine maintained solid fusion and a physical examination showed improvement. X-rays taken on January 18, 1985, and on April 18, 1985, were again essentially normal except for slight degenerative changes in his cervical spine; no further treatment was recommended.

Medical reports dated August, 1981, January, 1982, and February, 1994, indicated that Mr. Cook could return to work. Two other reports dated February, 1981, and September, 1992, indicated that Mr. Cook could not return to work. No doctor said that Mr.

Cook could not perform any work.[4] In finding that Mr. Cook could do only sedentary work, the ALJ gave him the benefit of every doubt in the medical records.

The record contains no medical evidence from April, 1985 through November, 1991. Mr. Cook testified that his back still hurt during this period, but he did not see a doctor because he could not find one who would accept his company's payments.

The ALJ also considered Mr. Cook's testimony, finding it not sufficiently credible to support a finding of continuous disability since September, 1980. As the ALJ noted, six years is a significant amount of time to go without treatment for a condition that is alleged to be disabling. The ALJ's assessment of a claimant's credibility is given great weight where, as here, it is supported by the record. *Shively v. Heckler,* 739 F.2d 987, 989 (4th Cir.1984).

> Sedentary work is defined as:
>
> [L]ifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). Substantial medical evidence, coupled with Mr. Cook's lack of credibility, supports the finding that Mr. Cook could perform such duties prior to, and on, March 31, 1985.

There is no merit to the claim that the ALJ failed to specify the reasons for his decision that Mr. Cook retained the ability to do sedentary work as of 1985. The ALJ specifically referenced the fact that none of Mr. Cook's treating physicians stated that he could not do other, less strenuous work. As noted, the ALJ also assessed Mr. Cook's subjective complaints of pain. While these complaints cannot be rejected simply because

objective medical evidence does not prove their severity, *Mickles v. Shalala,* 29 F.3d 918, 919–20 (4th Cir.1994); *Hyatt v. Sullivan,* 899 F.2d 329, 336–37 (4th Cir.1990), here, the ALJ cited specific reasons for finding that Mr. Cook's testimony in this regard was not credible. *Cf. Hammond v. Heckler,* 765 F.2d 424, 426 (4th Cir.1985) (ALJ's credibility decision should refer specifically to the evidence that formed the ALJ's conclusion).

Mr. Cook is also incorrect in asserting that the Commissioner failed to meet her burden of identifying the types of jobs that he could perform. After determining that Mr. Cook retained the ability to perform sedentary work, the ALJ then considered that Mr. Cook was a younger individual, 20 C.F.R. § 404.1563(b), with a high school education, 20 C.F.R. § 404.1564(b)(4), and past work experience as an unskilled laborer, 20 C.F.R. § 404.1568(a), and applied Rule 201.27 of the grids, which directs a finding of not disabled for such an individual. 20 C.F.R. Pt. 404, Subpt. P, App. 2. These grids take administrative notice that jobs exist in the national economy for claimants with certain age, education, previous work experience, and residual functional capacity. *Grant v. Schweiker,* 699 F.2d 189, 191–92 (4th Cir.1983).

■ The Commissioner may rely on the grids to sustain her burden of proving the existence of jobs that the claimant can perform, subject to two exceptions: 1) where the claimant's impairment restricts him from performing the full range of activity covered by a work category, or 2) where the claimant suffers from a non-exertional impairment that affects his ability to perform work of which he is exertionally capable. *Id.* at 192; *Hammond,* 765 F.2d at 425–26; *Smith v. Schweiker,* 719 F.2d 723, 725 (4th Cir.1984). Mr. Cook does not fit into either exception. He could perform a full range of sedentary work on and before March 31, 1985, and his pain did not affect his ability to perform sedentary work. Thus, the ALJ properly applied the grids to find that a significant

---

4. Mr. Cook had been hurt on the job and was represented by counsel; his medical bills were being paid by his employer. With the exception of the February, 1994 report, every report was addressed to an attorney or an insurance company; one doctor suggested that he apply for Worker's Compensation benefits. Under these circumstances, it is clear that the doctors were addressing the question whether Mr. Cook could return to his former job.

number of jobs existed in the national economy that Mr. Cook could have performed.

Finally, Mr. Cook raises issues he calls "constitutional." First, he believes that the Commissioner should "make known" to him or his counsel the credentials of the ALJ. He then proceeds with a generalized attack on ALJs, without specifying whether he is attacking the ALJ who heard his case or all ALJs. As this issue was not raised at the agency level, it is not before this court. *Pleasant Valley Hospital, Inc. v. Shalala,* 32 F.3d 67, 70 (4th Cir.1994). In any event, the failure to raise this issue at the administrative level means that it lacks factual support; Mr. Cook relies instead on counsel's opinions. Finally, Mr. Cook cites no constitutional provision or ruling to support this claim and the court knows of none.

■ Second, Mr. Cook questions whether the Department of Justice is the proper agency to represent the Commissioner in federal court. Again, Mr. Cook, though represented by counsel, fails to provide the court with any legal basis to support this novel assertion. There is, however, readily available authority to refute it. Congress has provided that, unless otherwise authorized by law, the officers of the Department of Justice, under the direction of the Attorney General, are responsible for the conduct of litigation in which the United States, an agency or officer thereof is a party. 28 U.S.C. § 516 (1995).

■ Mr. Cook further asserts that the Department of Justice should not be allowed to submit briefs that go beyond the scope of the ALJ's decision. However, judicial review of an ALJ's decision is based on the record as a whole. *Blalock v. Richardson,* 483 F.2d 773, 775 n. 4 (4th Cir.1972). Finally, the court respectfully declines Mr. Cook's invitation to step outside its jurisdiction to issue "guidelines" to an Executive agency.

### 6. *Conclusion.*

Substantial evidence supports the ALJ's finding that Mr. Cook was not disabled from September, 1980, to April, 1992. Accordingly, the Commissioner's decision is affirmed. By separate order, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.